IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| JEREMY JOHN BRAULICK, | Cause No. CV 21-18-BLG-SPW-TJC |
| Petitioner, | |
| vs. | ORDER |
| JAMES SALMONSEN; AUSTIN KNUDSEN, ATTORNEY GENERAL OF THE STATE OF MONTANA, | |
| Respondents. | |

Pending before the Court is state pro se petitioner Jeremy John Braulick's (Braulick) petition for federal habeas corpus relief filed pursuant to 28 U.S.C. § 2254. (Doc. 1.)

As previously explained to Braulick, this Court is required to screen all actions brought by prisoners who seek relief. 28 U.S.C. § 1915(a). The Court must dismiss a habeas petition or portion thereof if the prisoner raises claims that are legally frivolous or fails to state a basis upon which relief may be granted. 28 U.S.C. § 1915A(b)(1), (2).

Because it appeared that many of the claims contained in Braulick's petition were procedurally defaulted, he was advised that unless he could demonstrate a basis to excuse the default, the claims would be dismissed. (Doc. 5.) After being

1

provided multiple extensions of time, Braulick responded to the Court's order. (Doc. 15.)

As explained herein, Braulick's petition will be dismissed.  His claims are either procedurally defaulted, not cognizable in federal habeas, or do not survive deferential review under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).

I.   **Background**

The following facts, presumed to be correct under 28 U.S.C. §2254(e)(1), are taken from the Montana Supreme Court's decision affirming Braulick's convictions on direct appeal.  Additional facts will be supplied where necessary.

> On the evening of December 27, 2011, Braulick was sitting at the kitchen table in his mother's house in Livingston, eating burritos with his mother, Cheryl Kautzman, and his step-father, Scott Kautzman. Braulick, who was 39 years old at the time, was staying with the Kautzmans during the holidays. Braulick was between residences and had been staying with friends when he called Cheryl and asked to stay at the house for Christmas. Cheryl was initially reluctant, because there had been some "disruptive behavior" and "bad language" in the past. Scott told Braulick that he would be allowed to stay only if he agreed not to "blow up" and not to be abusive toward his mother. Scott and Braulick agreed that if those conditions were violated, Braulick would have to leave. Cheryl gave Braulick a key to the house.

> The Kautzmans kept a small television on the kitchen counter so they could watch the evening news. As they were eating dinner that night, they saw a commercial depicting the widow of a highway patrol officer who had been killed in a collision with a drunk driver. Braulick said it was unfair that the public was so sympathetic to police officers, while people whose lives were, as he perceived, ruined by the police received nothing. Cheryl explained to Braulick that the commercial was against drunk driving, and not necessarily in support of law enforcement. Scott told Braulick he thought law

2

enforcement officers did a very difficult job and deserved support. As Braulick became more agitated, both Cheryl and Scott reminded him of their agreement that he would have to leave if his behavior or language became aggressive. Braulick said he would leave, but on his own time. He walked out of the kitchen, and Cheryl followed, asking him to return the house key. Braulick refused, and Cheryl went out to the back porch to have a cigarette. Scott joined her.

A few minutes later, Braulick, who is six feet, five inches tall and weighed about 215 pounds at the time, rushed on to the porch and tackled Cheryl and Scott. Cheryl's head hit the floor and Scott said it looked like she had been knocked out. Braulick continued attacking Scott and trying to push him down the stairs to the basement. Scott clung to the bannister and "wouldn't go over." Scott recalled, "the next thing you know, I was in the corner of the wall and the door that goes outside kind of sitting on my legs, and I couldn't move. I don't know if he hit me behind the back of the head, or what, but I just couldn't move any part of my body." Scott fell to the floor two to three feet away from Cheryl. Braulick then kneeled on the floor and began choking Cheryl with his right hand and Scott with his left. When he stopped choking them, he hit Scott on the head several times. Cheryl attempted to crawl back to the kitchen, and Braulick hit her multiple times on the side of her face, breaking her glasses. Braulick then left the room. Scott and Cheryl were able to get up and walk to the living room. Cheryl told Scott her face hurt, and Scott said he would take her to the doctor. Braulick then entered the living room with a knife in his hand. Scott recognized the knife as one Braulick had showed him before, "kind of a trick knife. You spin it a couple ways and it comes out, and then you spin it a couple times and it goes back in." Cheryl saw the knife and said, "Oh, no. Oh, no."

The scene that followed was harrowing. Scott and Braulick pursued each other to the dining room, and then the kitchen. Braulick cut a gash in Scott's abdomen, through which Scott could see his own intestines spilling out. He put his hand over his abdomen to hold them in. Braulick then attacked Cheryl, stabbing her in the side. He then grabbed her from behind and stabbed her again in the breast. Scott, fearing for Cheryl's life, let go of his abdomen so he could use both hands to get the knife away from Braulick. Scott somehow got the knife, and Braulick left. There was so much blood that Scott recalled they were "slipping and sliding" on the kitchen floor. Cheryl appeared to be looking for something in the kitchen, and Scott urged her to get out of the house. Scott found he could not open the back door

because his hand was badly cut. He eventually managed to open the door and the couple ran outside, calling for help. Scott found Braulick's cell phone on the porch, but did not know how to work it. Cheryl, who remembers only "bits and pieces" of the events, then told Scott she had a cell phone in her pocket. She called 911.

Livingston Police Department Officers Steve Kunnath and Matthew Tubaugh and Park County Sheriff's Deputy Jason Hopkin and Sergeant Clay Herbst responded to the call, arriving at the house almost simultaneously. They immediately saw Cheryl in front of the house, with her hands in the air, holding a cell phone. Cheryl said, "He stabbed me," and pointed to the back of the house. Hopkin remained in front with Cheryl while Kunnath, Tubaugh, and Herbst headed toward the back of the house. Hopkin looked around for signs of the direction the suspect may have fled, and observed a blood trail. He began following the blood trail, and saw a man approaching. The man was covered in blood and had a knife in his hand. Hopkin said the man "looked kind of like a zombie the way he was walking side to side, kind of stiff-legged, and he had a blank stare on his face." Believing the man was a suspect, Hopkin ordered him to drop the knife. When he did so, Hopkin approached and "saw his intestines coming out the side of his shirt." Hopkin realized the man was a victim, laid him on the ground, assessed his injuries, and applied compression to his abdominal wound. Hopkin called an ambulance and learned that the man was named Scott, and that he had been attacked by his step-son.

The other officers heard Hopkin's encounter with Scott and went to assist. They soon realized that Scott was not the suspect, and Herbst and Tubaugh left to search inside the house. Kunnath remained with Hopkin until the ambulance arrived, then went to the back yard to continue searching for the suspect. In the back yard, Kunnath saw a tall, dark figure approaching and thought it might be a neighbor coming out to see what was going on. He asked the person who he was.  The person identified himself as Jeremy Braulick, held out a set of dog tags, and said, "I did it. I'm ready to go to jail." Braulick cooperated as Kunnath placed him in handcuffs and led him to the front of the house. Kunnath then turned on his audio recorder. Kunnath sat Braulick down on the front steps, and asked, "So, Jeremy, what's going on? What happened here?" Braulick responded, "What happened? I don't have a life, dude, and they want to talk to me like I'm a lowlife, and that's it. I, I want a, I want an attorney and that's it." Kunnath asked again, "Jeremy, what happened to your dad? What happened to your

4

step-dad?" Braulick responded, "I don't know. He's not my dad. And I want to go. I want to get out of here." Kunnath told Braulick he would need to sit there. Braulick then said, "I never assaulted anybody in my life until now, so." Kunnath placed Braulick in a patrol car.

Kunnath drove Braulick to the detention center and Tubaugh followed. As the officers prepared to remove Braulick from the patrol car, another officer can be heard on the recording saying, "Find out how long he's been here. If it's over 72 hours, add failure to register. He should be in Bozeman. He should have checked in with me, and he knows this." At a pre-trial suppression hearing, Tubaugh testified that as Braulick was escorted into the holding area, Tubaugh detected a "clear odor" of alcohol and observed that Braulick appeared very distraught. Mindful of the violent nature of the attack in the Kautzmans' house, Tubaugh also observed that Braulick was considerably larger than most of the officers. Tubaugh approached Braulick in the holding area and said:

> I'm only going to tell you this one time, okay? Because of the elevation of what's happened this evening, if you're not compliant, we're not going to mess around with you. Do you understand? That's not a threat, that, that's, that's just the way it's going to be. Okay, so, you stay at this level, we are perfectly good. Otherwise, we're going to go to an extreme level very quickly. I appreciate your cooperation. I just want you to understand that.

Tubaugh then asked Braulick how much alcohol he had consumed that day. He also asked Braulick how long he had been at the Kautzmans' house and whether he was just visiting or living there. Tubaugh advised Braulick he would be charged with two counts of aggravated assault, one of which may be increased to attempted homicide. He then said, "I'm not going to ask you any questions because I haven't Mirandized you. But when we get downstairs, if you want to talk to me, I'll talk to you."

Braulick was sobbing as he was taken from the holding area to the detention center. The officers did not question him at this time. Braulick continued to make unprompted exclamations, saying, "I don't care anymore, just give me my max time. I'm fucking tired, dude, I'm tired of fighting with people." He complained about the way his parents talked to him and the way he had been treated since leaving California, where he "had women that liked [him]," to come to Montana. He said, "But now I have, so now I'm fucking screwed,

5

dude." He went on to complain about how he doesn't have any money, but people who do have money—specifically referencing O.J. Simpson and John "The Teflon Don" Gotti—murder people and get off "Scot free." Braulick was later read his *Miranda* rights by Detective Joseph Harris, and he declined to waive his rights and be interviewed.

Braulick was charged with two counts of attempted deliberate homicide, with a penalty enhancement for use of a dangerous weapon. Before trial, he moved to suppress statements made while in custody on the grounds that he was never informed of his right to remain silent, pursuant to *Miranda,* and that all questioning by law enforcement should have stopped when he asked for an attorney. The District Court held a suppression hearing on September 10, 2012, hearing testimony from Kunnath, Tubaugh, Scott, and Cheryl. Kunnath testified that when he asked Braulick, "What happened to your step-dad," he was still not certain Braulick was the suspect. Kunnath was "trying to figure out what the whole situation was," particularly as other officers were still inside the house, and the 911 call had not included a report of how many people were present. Tubaugh testified that his questions about Braulick's drinking were part of the booking process, because heavily intoxicated persons may require medical clearance. Tubaugh also testified that he asked Braulick how long he had been staying at the Kautzmans' house because he wanted to know, for officer safety, if Braulick could have gone somewhere else during the time he left the scene or if there could be additional persons involved. On cross-examination, defense counsel pointed out that Tubaugh never asked Braulick how many people were at the house.

After the suppression hearing, the District Court adopted the State's proposed findings and conclusions as accurately stating the relevant facts and law. The District Court concluded there had been no custodial interrogation of Braulick, finding that his statements were spontaneously blurted while Braulick sobbed and talked to himself. The District Court did, however, order that Tubaugh's question about Braulick's alcohol consumption was to be "edited out of any tape and omitted from any testimony presented by the State," finding that the amount Braulick had been drinking was more prejudicial than probative. The trial began December 18, 2012, with Scott and Cheryl as the first and second witnesses, respectively. Braulick objected to allowing Cheryl to remain in the courtroom during Scott's testimony. The District Court ruled that as victims of a criminal offense, both Scott and Cheryl had the right to be present for the trial. During Cheryl's testimony, the State asked her at several points if she

recalled Scott's testimony and if it was accurate. Later in the trial, Kunnath testified and an audio recording made during his encounter with Braulick was played for the jury. Kunnath also read portions from a transcript of the recorded statements made by Braulick, including the statements, "I've never assaulted anybody in my life, until now," "I don't care anymore, just give me my max time," and "But now I have, so now I'm fucking screwed, dude." Tubaugh did not testify at trial.

See State v. Braulick, 2015 MT 147, ¶¶ 3-12, 379 Mont. 302, 349 P. 3d 508.

Following the jury trial, Braulick was convicted of two counts of Attempted Deliberate Homicide.  On January 4, 2013, Braulick was sentenced to two eighty (80) year commitments to the Montana State Prison for Attempted Deliberate Homicide, with each to be followed by a ten (10) year commitment to the Montana State Prison for the use of a dangerous weapon in commission of the offense.  The sentences were ordered to run concurrently with each other.  Braulick also received a forty (40) year parole restriction.

### i.    Direct Appeal

Braulick timely filed a direct appeal, arguing: (1) the district court erred when it denied his motion to suppress statements made after he was taken into custody, after he requested an attorney, and before he was read his *Miranda* rights, and (2) the district court erred when it denied his motion to exclude one of the victims, his mother Cheryl, from the courtroom.  The Montana Supreme Court affirmed Braulick's conviction and sentence.  *See generally State v. Braulick*, 2015 MT 147.

### ii.    Post-Conviction

Braulick then filed a petition for post-conviction relief (PCR) in the state district court in which he raised 15 claims, alleging both ineffective assistance of trial counsel (IAC) and prosecutorial misconduct; he also challenged the conditions of his confinement.  The district court ordered the state to respond but did not hold a hearing on Braulick's petition.  The district court subsequently entered an Order denying Braulick's petition.  *See Braulick v. State*, Cause No. DV 16-118, Or. (Sept. 12, 2016).[1]  The court concluded all but one of Braulick's IAC claims were procedurally defaulted because Braulick should have raised them on direct appeal. *Id.* at 4-5, 6.  As to the remaining claim that Braulick's counsel performed an insufficient pretrial investigation, the Court concluded the claim lacked merit because Braulick failed to prove either prong of the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  *Id.* at 4.  The Court further determined that Braulick's prosecutorial misconduct claims were procedurally defaulted because Braulick should have raised the claims on direct appeal.  *Id.* at 5-6.  The district court also declined to rule on Braulick's claim relating to his conditions of confinement, finding it was inappropriately raised in a postconviction petition. *Id.*

---

[1] For purposes of clarity, a copy of the PCR decision will be filed contemporaneously with this Order. This court may take judicial notice of proceedings in other courts, within and without the federal judicial system, if those proceedings have a direct relation to the matters at issue. *Trigueros v. Adams*, 658 F. 3d 983, 987 (9th Cir. 2011).

at 6.

### iii.    Post-conviction Appeal

Braulick appealed the district court's denial of his postconviction petition and determination that his claims were record-based.  He also alleged for the first time on appeal that his appellate counsel provided ineffective assistance (IAC) for failing to raise a claim of cumulative error, present IAC claims on direct review, and argue prosecutorial misconduct based upon comments made by the prosecution regarding Braulick's post-arrest silence ("*Doyle* error").[2]  *See Braulick v. State*, DA-16-0596, Br. Of Appellant, p. 1 ("Statement of the Issues") (filed August 8, 2018).  Further, Braulick requested that the Court allow him to amend his original PCR petition if it was determined the claims he did not raise in the district court had merit.  *Id.*

The Montana Supreme Court found that the district court erred when it determined that Braulick's IAC claims were barred on PCR.  *See Braulick v. State*, 2019 MT 234N at ₱ 7, 398 Mont. 443, 2019 WL 4786881.  But the Court affirmed the lower court on different grounds.  Specifically, the Court noted Braulick was unable to prove that counsel's performance fell below an objective standard of

---

[2] In *Doyle v. Ohio,* 426 U.S. 610 (1976), the Court held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." 426 U.S. at 619.

reasonableness as required by *Strickland v. Washington*, 466 U.S. 668 (1984). *Id.* at ¶ 8. Further, the Court noted Braulick failed to establish he was prejudiced by counsel's performance. *Id.* As to Braulick's prosecutorial misconduct claims, the Montana Supreme Court affirmed the lower court and held all the allegations were record based and should have been raised on direct appeal. *Id.* at ¶ 9. Because Braulick failed to present the claims, state law precluded review of the claims in postconviction review. *Id.* (citing MCA § 46-21-105). Similarly, the Court determined that the district court properly denied Braulick's cruel and unusual punishment claim, because it "reasonably could have been raised on direct appeal." *Id.* at ¶ 10 (citing Section 46-21-105(2), MCA).

### iv.   Sentence Review

Braulick sought review of his sentence with the Montana Sentence Review Division (SRD) of the Montana Supreme Court. On February 8, 2021, his sentence was affirmed.[3]

In the instant petition, Braulick raises twenty-five claims. (*See e.g.* Doc. 5 at 9-11.) He asks this Court to review his direct appeal, postconviction appeal, and Sentence Review proceedings for any constitutional violations or other violations

---

[3] *See* Sentence Review Division: https://courts.mt.gov/Courts/boards/SentenceReviewDivision (accessed June 2, 2023).

or errors made by the Montana Supreme Court. (Doc. 1 at 7, ¶ 17.) Additionally, he asks that the judgment denying him a new trial be overruled. *Id.*

## II.   Procedural Default: Claims 10-16 & 18-23

"A federal habeas court generally may consider a state prisoner's federal claim only if he has first presented that claim to the state court in accordance with state procedures." *Shinn v. Martinez Ramirez*, 596 U.S. __, 142 S.Ct. 1718, 1727 (2022). Thus, a claim not raised before the state courts is procedurally defaulted, but the procedural default can be overcome if certain circumstances are met. As explained below, many of Braulick's claims are procedurally defaulted. As further explained, Braulick has failed to make the requisite showing required to excuse the default of these claims.

Claims 10-15 of the present petition allege prosecutorial misconduct. (*See* Doc. 1 at 12-15.) In Claim 16, Braulick challenges the conditions of his confinement, alleging that he was subject to cruel and unusual punishment. (*Id.* at 16.) The Montana Supreme Court determined on PCR appeal that all of these claims should have been raised on direct appeal and were precluded from review pursuant to Mont. Code Ann. § 46-21-105. *See Braulick*, 2019 MT 234N at ¶ 14-15. This Court previously observed that the statute appeared to be an adequate and independent basis for the denial of these claims. (*See* Doc. 5 at 14)(citing *Ake v. Oklahoma*, 470 U.S. 68, 74-75 (1985); *Collier v. Bayer*, 408 F.3d 1279, 1284 (9th

Cir. 2005)).

Braulick presented Claims 18-23 for the first time on appeal from the denial

of his PCR petition. But because the claims were not presented to the district

court, the Montana Supreme Court did not address them on appeal.

Braulick does not take issue with this Court's determination that the

referenced claims are defaulted. Instead, he first argues that the default of these

claims should be excused because, MCA § 46-21-105, was not consistently applied

in his case. Specifically Braulick states he was not allowed to amend his petition

on PCR appeal, despite the fact that he asked the Montana Supreme Court that he

be allowed to do so. (*See* Doc. 15 at 1-2.) Braulick argues under state law that he

had the ability to amend his petition at any time and it was error to preclude him

from so doing. (*Id.* at 1.)

> Braulick is mistaken. MCA § 46-21-105(1)(a) provides:
>
> All grounds for relief claimed by a petitioner under 46-21-101 must be
> raised in the original or amended original petition. **The original petition
> may be amended only once**. At the request of the state or on its own
> motion, the court shall set a deadline for the filing of an amended original
> petition. If a hearing will be held, the deadline must be reasonably in
> advance of the hearing but may not be less than 30 days prior to the date of
> the hearing.

(emphasis added). Thus, the allowance for amendment only applies to the original

petition filed in the district court, not on appeal. Accordingly, Braulick had no

legal avenue available to him to raise the defaulted claims on appeal from the

12

denial of his PCR petition, by filing an amended PCR petition during his appeal.

Further, MCA § 46-21-105(2) provides:

When a petitioner has been afforded the opportunity for a direct appeal of the petitioner's conviction, grounds for relief that were or could reasonably have been raised on direct appeal may not be raised, considered, or decided in a proceeding brought under this chapter.

Accordingly, the Montana Supreme Court's finding that Braulick was precluded by statute from raising Claims 10-16 in PCR proceedings because he failed to raise them on direct appeal, is a finding supported in state law.

Generally, when a state court's rejection of a federal claim "rests on a state law ground that is independent of the federal question and adequate to support the judgment," a habeas petitioner has procedurally defaulted his claim. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). To constitute an "adequate" state ground, a procedural bar must be one that is "clear, consistently applied, and well-established at the time of the petitioner's purported default." *Martinez v. Klauser*, 266 F.3d 1091, 1093-94 (9th Cir. 2001). To constitute an "independent" state procedural bar, the bar must rest on a purely state law ground. A state procedural rule is deemed to be independent if it is not interwoven with federal law or dependent upon a federal constitutional ruling. *Michigan v. Long*, 463 U.S. 1032, 1040 (1983). A state-law ground is interwoven if "the state has made application of the procedural bar depend on an antecedent ruling on federal law [such as] the determination of whether federal constitutional error has been committed." *Ake*,

13

470 U.S. at 75; *see also, Park v. California*, 202 F.3d 1146, 1152 (9th Cir. 2000).

Braulick fails to show that § 46-21-105 was not an adequate or independent basis

for the denial of these claims.

Further, the Montana Supreme Court, as an appellate court, follows the

general rule that it will not address issues raised for the first time on appeal. *See*

*e.g. Day v. Payne,* 280 Mont. 273, 276, 929 P.2d 864, 866 (1996) (citation

omitted). The rationale behind this rule is that "it is fundamentally unfair to fault

the trial court for failing to rule correctly on an issue it was never given the

opportunity to consider." *Becker v. Rosebud Operating Services, Inc.,* 191 P.3d

435, 439 (Mont. 2008)(additional citations omitted). Because claims 18-23 were

raised for the first time on PCR appeal, this rule, coupled with MCA 46-21-105,

provides an adequate and independent grounds for the denial of Claims 10-16 and

18-23. These claims were properly excluded under state law.

Braulick attempts to argue that he can demonstrate adequate cause and

prejudice to excuse the default of these claims. (*See e.g.* Doc. 15 at 5-6.) A

petitioner may overcome the prohibition on reviewing procedurally defaulted

claims if he is able to show "cause" to excuse his failure to comply with the state

procedural rule, and "actual prejudice resulting from the alleged constitutional

violation." *Coleman*, 501 U.S. at 750; *Wainwright v. Sykes*, 433 U.S. 72, 84

(1977). As "cause" Braulick claims he instructed appellate counsel to raise at

14

least some of these defaulted claims on direct appeal, but that counsel failed to do so. (*Id.* at 4-5, 6.)

"Cause for a procedural default exists where something external to the petitioner, something that cannot fairly be attributed to him,…impeded his efforts to comply with the State's procedural rule." *Maples v. Thomas*, 565 U.S. 266, 280 (2012)(citation omitted); *Coleman*, 501 U.S. at 753. While attorney ignorance or inadvertence cannot establish cause for a procedural default, "[a]ttorney error that constitutes ineffective assistance of counsel is cause[.]" *Coleman*, 501 U.S. at 753-54; see also *Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017) ("It has long been the rule that attorney error is an objective external factor providing cause for excusing a procedural default only if that error amounted to a deprivation of the constitutional right to counsel."). The ineffective assistance claim must be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000)(citing *Murray v. Carrier*, 477 U.S. 478, 489 (1986)).

This Court must reject the argument that the default of these claims is excused by the alleged ineffective assistance of appellate counsel because that claim, too, is procedurally defaulted. That is, before ineffective assistance of appellate counsel may be used to excuse a procedural default, the particular ineffective assistance allegation must first be exhausted in state court as an

independent claim. *See Edwards*, 529 U.S. at 453 ("an ineffective assistance of

counsel claim asserted as cause to excuse the procedural default of another claim

can itself be procedurally defaulted"); *see also Tacho v. Martinez*, 862 F. 2d 1376,

1381 (9th Cir. 1988). Because Braulick never properly presented an IAC claim

pertaining to appellate counsel, he cannot use that argument to excuse the default

of his other claims. Moreover, Braulick's contention that he checked a box on the

PCR form that referenced ineffective assistance of appellate counsel, (*see* Doc. 15

at 3-4), does not constitute fair presentation of the claim in accordance with state

procedures. *See Shinn*, 142 S. Ct. at 1717.

In sum, Braulick cannot show cause to overcome the default of these claims.

Absent cause, the Court does not consider whether there was prejudice. Claims

10-16 and 18-23 must be dismissed as procedurally defaulted without excuse.

III.    **Non-Cognizable Claim: Claim 25**

Braulick asserts that the SRD erred when it affirmed his lengthy "bogus"

sentence, including the 40-year parole restriction, for an altercation involving a

pocket knife with a 2 ¾" blade. (Doc. 1 at 23.) Braulick alleges various

infirmities with his sentence review hearing, including that his attorney performed

inadequately and was rude following the hearing, informing Braulick, "what did

you expect, your own mom testified against you?" (*Id.*) Braulick further asserts

the prosecutor made "false and exaggerated" statements. (*Id.*) Braulick also

claims he was unable to adequately present his mitigating circumstances during the hearing, including his medical records demonstrating he suffered from hypothyroidism. (*Id.*) Braulick acknowledges that this claim is unexhausted. (*Id.* at 24.)

To the extent that Braulick alleges error in the application of state sentencing laws, his claim is not cognizable in federal habeas. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). In limited circumstances, a state court's misapplication of state sentencing law may provide a basis for federal habeas relief if it is so arbitrary or capricious as to constitute an independent constitutional violation. *Id.* In the instant case, Braulick does not allege that the sentencing errors of which he complains implicate a constitutional right. Rather, he seems to believe the sentence is unjust and "bogus." The claim as presented, at most involves application of state sentencing law and does not give rise to a federal question cognizable on habeas review. *Souch v. Schaivo*, 289 F. 2d 616, 622-23 (state prisoner's challenge court's exercise of discretion under state sentencing law fails to state a federal habeas claim). Even if Braulick could establish that state law was erroneously interpreted or applied in his case, such a claim is not remediable on federal habeas review. *See Swarthout v. Cooke*, 652 U.S. 216, 219-22 (2011). This claim is not cognizable in federal habeas and will be denied.

//

IV.   **§2254(d) Analysis of Remaining Claims**

As explained above, the Montana Supreme Court addressed the claims

raised on direct appeal (Claims 1 & 2) and Braulick's IAC Claims (Claims 3-9, 17

& 24) on postconviction appeal, determining they all lacked merit.  Therefore, this

Court's consideration of the claims is constrained by the applicable standard of

review.  The AEDPA "bars relitigation of any claim 'adjudicated on the merits' in

state court subject only to the exceptions listed in §§ 2254(d)(1) and (d)(2)."

*Harrington v. Richter*, 562 U.S. 86, 89 (2011).  Accordingly, this Court cannot

grant habeas relief under AEDPA unless the state court's analysis "was contrary to,

or involved an unreasonable application of, clearly established Federal law," 28

U.S.C. § 2254(d)(1), or it "was based on an unreasonable determination of the

facts," *id*. § 2254(d)(2).  "This is a difficult to meet and highly deferential standard

for evaluating state-court rulings, which demand that state-court decisions be given

the benefit of the doubt."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal

citation and quotations omitted).

**Direct appeal claims**

i.   *Miranda* **Violation: Claim 1**

Braulick alleges that a violation occurred, in contravention of *Miranda v.*

*Arizona,* 384 U.S. 436 (1966), during his custodial interrogation.  (Doc. 1 at 4.)  He

asserts he made statements while he was in custody and was interrogated without

his *Miranda* rights[4] being read to him. (*Id.*) He alleges that the police officers continued to question him after he invoked his right to an attorney. (*Id.*)

In *Miranda v. Arizona,* 384 U.S. 436, 444 (1966), the Supreme Court declared that a person interrogated by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has the right to remain silent, that any statements he does make may be used against him, and that he has a right to the presence of an attorney, either retained or appointed." Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial. *See Stansbury v. California,* 511 U.S. 318, 322 (1994).

The Montana Supreme Court began analyzing Braulick's claim by looking at whether or not Braulick was subject to custodial interrogation. The Court determined that Braulick was in custody when he was handcuffed, led away by a law enforcement officer, and told that he could not leave. *State v. Braulick,* 2015 MT 147, ¶ 18. The Court then turned to Braulick's statements and whether they

---

[4] In *Miranda,* 384 U.S. at 444, the Supreme Court declared that a person interrogated by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has the right to remain silent, that any statements he does make may be used against him, and that he has a right to the presence of an attorney, either retained or appointed." Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial. *See Stansbury v. California,* 511 U.S. 318, 322 (1994).

were the product of interrogation.

Officer Kunnath asked Braulick the following: "So Jeremy, what's going on? What happened here?" and "Jeremy, what happened to your dad? What happened to your step-dad?" *Id.* at ⁋ 19. Kunnath explained during the suppression hearing that he and the other officers at the scene did not understand what had happened or how many people had been involved in the incident. The Court noted this explanation was supported by Hopkin's testimony, who moments prior had attempted to detain Scott, despite his serious injuries, believing him to be a potential suspect. Both Scott and Braulick were covered in blood and found outside the home. *Id.* The Court determined Kunnath's limited questioning at this time was a reasonable effort to obtain information about the events occurring at the scene and, accordingly, the requirements of *Miranda* did not yet attach. Kunnath stopped questioning Braulick after asking him about Scott. Braulick, however, continued to make unprompted statements, including "I never assaulted anybody in my life until now, so." *Id.* Because such statements were not made in response to an interrogation, they were admissible in the absence of a *Miranda* warning. *Id.*

Braulick also argued on appeal that all of the statements he later made, following his exchange with Officer Tubaugh at the jail, and after he invoked his right to counsel, should have been excluded. The Court disagreed, holding that under *Miranda*, exclusion of a defendant's spontaneous outbursts is not mandated.

*Id.* at 21. The Court found that Braulick's spontaneous statements made at the jail, were not made in response to any questions from the officers and that he was simply talking to himself in his distressed state. *Id.* Accordingly, they were not subject to exclusion under *Miranda*.

The Court found that the procedural safeguards of *Miranda* exist to protect an accused from the coercive effects of custodial interrogation, not "to grant a criminal suspect license to spontaneously blurt incriminating statements without fear of recrimination." *Id.* at 22.  Braulick's failure to obtain the benefit of his Fifth Amendment privilege against self-incrimination was attributable to his own actions and not those of law enforcement.  *Id.*

Like the Montana Supreme Court, this Court will presume that Braulick was in custody.  Setting aside the custodial requirement of *Miranda*, it appears the Montana Supreme Court's finding that Braulick was not subject to interrogation was a reasonable application of *Miranda* and its progeny.  Interrogation is "express questioning or its functional equivalent" by persons acting on behalf of the government. *Rhode Island v. Innis,* 446 U.S. 291, 300–01 (1980) (defining "functional equivalent" as "words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect"). As the Supreme Court has recognized, " '[i]nterrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion

21

above and beyond that inherent in custody itself." *Innis,* 446 U.S. at 300. "The fact

that statements made by an officer may have struck a responsive chord, or even

that they may have constituted subtle compulsion is insufficient to find that they

were the functional equivalent of interrogation." *United States v. Foster,* 227 F.3d

1096, 1103 (9th Cir.2000) (quoting *United States v. Moreno–Flores,* 33 F.3d 1164,

1169–70 (9th Cir.1994)).  Thus, not every question posed by an officer constitutes

an interrogation.

In the present case, when Officer Kunnath asked Braulick what was going

on and what had happened to his step-dad, he was attempting to ascertain what had

occurred at a violent and bloody crime scene.  From the officers' initial encounters

with Braulick and Scott, none were initially sure who was the perpetrator and who

was the victim of the crime.  Kunnath's query to Braulick was reasonably related

to his attempt to obtain information concerning his suspicions about the crime

scene.  There was nothing coercive about Kunnath's two questions to Braulick.

Additionally, he ceased questioning after this initial inquiry.  Thus, the Montana

Supreme Court reasonably determined that during this interaction Braulick was not

subject to interrogation. *See United States v. Rodriguez*, 869 F. 3d 479, 484 n. 2

(9th Cir 1989).

Similarly, Braulick's spontaneous statements made after he was allegedly

interrogated without *Miranda* warnings does not render those statements

22

inadmissible. Where "the prior statement was voluntary in the sense that it was not coerced in violation of the [F]ifth [A]mendment, though obtained in technical violation of the *Miranda* requirements," courts suppress a subsequent statement only if the subsequent statement was not voluntarily made. *See United States v. Wauneka,* 770 F.2d 1434, 1440 (9th Cir.1985) (citing *Oregon v. Elstad,* 470 U.S. 298 (1985). To determine if the subsequent statement was voluntarily made, courts take into consideration the surrounding circumstances, the combined effect of the entire course of the officer's conduct upon the defendant, including the effect of his previously having made a confession, and the manner in which the officers utilized this prior confession in obtaining a second confession." *Id.; see also United States v. Cole,* 315 F.3d 633, 636 (6th Cir.2003) (suppressing defendant's initial response to the question, "Whose gun is this?" but denying motion to suppress subsequent, voluntary statements).

There is nothing in the record before this Court to suggest that the spontaneous statements Braulick made at the jail were in response to questions posed by Officer Tubaugh or others. While Braulick was understandably in distress at the jail, there is no indication that the circumstances or the conduct of the officers served to elicit remarks from Braulick, rather the statements were the product of his own outbursts. Because the statements were voluntary, there is no basis for exclusion under *Miranda.* The Montana Supreme Court reasonably

23

denied this claim; this Court must afford deference under § 2254(d).

ii.    Application of MCA § 46-24-106: Claim 2

The victims of the offense, Scott and Cheryl, were the State's first two witnesses. The State notified Braulick prior to trial that both Scott and Cheryl intended to be present for the full proceedings. Braulick moved to have Cheryl excluded during Scott's testimony, pursuant to Mont. R. Evid. 615. The district court found, however, that as a victim of the crime, Cheryl had a statutory right to be present during the trial, pursuant to Mont. Code Ann. § 46-24-106. On appeal, the Montana Supreme Court noted that a court must normally order the exclusion of witnesses when requested to do so. *Braulick*, 2015 MT 147, ¶ 24, *citing* Mont. R. Evid. 615. But the Court determined the district court properly applied the plain language of § 46-24-106 and allowed Cheryl to be present during Scott's testimony. *Id*. at ¶ 25. Further, the Court found Braulick failed to present any specific facts that would have supported Cheryl's exclusion. *Id*.

Braulick argues that his right to a fair trial was violated by the court's misinterpretation of MCA § 46-24-106. To the extent that this claim alleges a violation of state law, the claim is not cognizable on habeas review. A state prisoner is entitled to habeas relief under 28 U.S.C. § 2254 only if he is held in violation of the Constitution, laws or treaties of the United States. Federal habeas relief is not available for alleged errors in the interpretation or application of state law. *Estelle*

24

*v. McGuire*, 502 U.S. 62 (1991).   Moreover, the Montana Supreme Court held, on direct appeal, that the lower court properly interpreted and applied state law.  Neither this Court nor the United States Supreme Court may question the Montana Supreme Court's interpretation of Montana law.  *See, e.g.*, *Wisconsin v. Mitchell*, 508 U.S. 476, 483 (1993) ("There is no doubt that we are bound by a state court's construction of a state statute."); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today we reemphasize that it is not the province of a federal habeas court to reexamine state court determinations on state law questions.").  And even if the State had violated state law, Braulick would not be entitled to federal habeas relief on that basis.  *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (per curiam); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).

Although he does not identify a federal constitutional violation, (*see* Doc. 1 at 5), the Court presumes Braulick may be attempting to assert a due process violation.  But a violation of state law, without more, does not deprive a petitioner of due process.  *Cooks v. Spalding*, 660 F. 2d 738, 739 (9th Cir. 1981), cert. denied, 455 U.S 1026 (1982).  It has long been understood that a state may violate its own law without violating the United States Constitution.  *Gryger v. Burke*, 334 U.S. 728, 731 (1948)("We cannot treat a mere error of state law, if one occurred, as a denial of due process; otherwise, every erroneous decision by a state court on state law would come here as a federal constitutional question.").  To qualify for federal

habeas relief, an error of state law must be "sufficiently egregious to amount to a denial of equal protection or of due process of law guaranteed by the Fourteenth Amendment." *See Pully v. Harris*, 465 U.S. 37, 41 (1984). Braulick has not shown that any state law violation occurred, much less that such error was "so arbitrary and fundamentally unfair that it violated due process." *See Jammal v. Van de Kamp*, 926 F. 2d 918, 920 (9th Cir. 1991)(quotation omitted).

In the instant case, Braulick has failed to show that the trial court's application of state law was erroneous. The Montana Supreme Court concluded the lower court properly applied state law. Braulick has presented nothing that would allow this Court to conclude to the contrary and find the state court's actions to be so egregiously wrong as to amount to a violation of due process. Accordingly, this Court must afford deference to the state courts under Section 2254(d).

### iii.   IAC Claims- Claims 3-9, 17 & 24

Before this Court, Braulick alleges trial counsel was ineffective in various aspects. (*See* Doc. 1 at 9-12, 16-17, 22.) These claims are similar in nature to the IAC claims presented in state court. As set forth above, the district court refused to address these claims on PCR, finding that they could have been raised on direct appeal. The Montana Supreme Court found the lower court erred in this determination, and instead addressed Braulick's IAC claims on the merits. The

claims were ultimately denied.

Under *Strickland*, an individual claiming IAC has the burden of demonstrating that (1) the attorney made errors so serious she was not functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense. *See Williams v. Taylor*, 529 U.S. 362, 390-91 (2000) (citing *Strickland*, 466 U.S. at 687). To establish ineffectiveness, the defendant must show that counsel's representation fell below an objective standard of reasonableness. To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is "probability sufficient to undermine confidence in the outcome." *Id.* Additionally, any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct, in order to avoid the distorting effects of hindsight. *Strickland*, 466 U.S. at 689. It is the petitioner's burden to overcome the presumption that counsel's actions might be considered sound strategy. *Id.*

Under the first prong, the Montana Supreme Court found that Braulick failed to overcome the strong presumption that counsel performed reasonably. The Court noted:

> Trial counsel navigated difficult terrain in defending a violent assault upon victims, members of the Defendant's family, who survived and testified

27

> about the attack. Counsel's approach to attempting impeachment of the
> victim witnesses, objecting to the prosecution's presentation of the victims'
> stories and photos of the victims' wounds, and presenting evidence of his
> client's defense, were clearly matters of delicate trial strategy that Braulick
> has not demonstrated were unreasonable and below a lawyer's standard of
> performance. Likewise, Braulick has not demonstrated his counsel's failure
> to diagnose a rare health condition that may have altered his approach to
> plea negotiation falls below a standard of reasonableness. Therefore,
> Braulick had not established the first prong of *Strickland,* which alone
> invalidates his ineffective assistance of counsel claim.

*See Braulick v. State*, 2019 MT 234N at ⁋ 8.  The Court noted that because

Braulick could not meet the first *Strickland* prong, it need not address the second

prejudice, but did so nonetheless.

The Court went on to find that Braulick failed to prove a reasonable

probability existed that, but for counsel's errors, the result of the proceeding would

have been different.  *Id*.  The Court noted that the asserted errors against counsel

did not "undermine the overwhelming direct evidence of Braulick's guilt,

including the compelling testimony of Braulick's Mother and Stepfather."  *Id*.  In

relation to his health diagnosis, the Court found Braulick only argued that counsel

probably would have discovered his condition if she had investigated it further.  *Id*.

In short, because Braulick failed to meet either prong of *Strickland*; his IAC claims

were properly denied.  *Id*.

Because the state court has already rejected Braulick's IAC claims, this

Court may only grant relief if that decision was contrary to or an unreasonable

application of *Strickland*.  *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003).  There

is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* The Supreme Court has described federal review of a state court's decision on an IAC claim as "doubly deferential." *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)(quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). "[T]he question [under § 2254(d)] is not whether counsel's actions were reasonable. The questions is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Richter*, 562 U.S at 105.

Applying these standards to Braulick's IAC claims, it is apparent that he has failed to show the Montana courts' denial of his IAC claims was contrary to or involved an unreasonable application of *Strickland.*

Braulick raises nine distinct IAC claim, however, there is overlap between them. Generally Braulick alleges that trial counsel failed to adequately impeach Scott and Cheryl regarding inconsistencies s in their stories,[5] (Doc. 1 at 9, 10); counsel failed to do a thorough investigation and should have had an investigator question the victims, police officers, and medical staff about statements or actions Scott and Cheryl "may or may not have made" and should have questioned jailers about Braulick's physical state and potential evidence at the crime scene;[6] (*id.* at 9-

---

[5] These are contained in Braulick's petition as Claims 3 and 5.
[6] Braulick's Claim 4.

10); counsel failed to seek suppression of a photo showing Scott's intestines on the

operating table that was unduly prejudicial,[7] (*id.* at 10); counsel failed to object to

many misstatements made by the state's witnesses,[8] (*id.* at 11); counsel failed to

make "many arguments" in Braulick's defense and point to favorable evidence,[9]

(*id.* at 11); counsel failed to argue for a better plea deal based upon Braulick's

diagnosis of hypothyroidism and should have discovered whether Braulick was

experiencing symptoms of the condition prior to the underlying events,[10] (*id.* at 11-

12); and counsel failed to object to statements made by the prosecutor that

constituted prosecutorial misconduct, including remarks upon Braulick's post

arrest silence and mischaracterization of Braulick's view of himself and his

thoughts/intent, leading questions during Cheryl's testimony, personal opinions

regarding Braulick's guilt/credibility, and bolstering of victims' credibility,[11] (*id.* at

15, 17, 22)

But the gravamen of Braulick's complaints against counsel are aimed at her

trial strategy. Counsel has responsibility for making decisions about strategy and

tactics and is not bound by the instructions or wishes of the client on such matters:

> Trial management is the lawyer's province: Counsel provides his or her
> assistance by making decisions such as "what arguments to pursue, what

---

[7] Claim 6.
[8] Claim 7.
[9] Claim 8.
[10] Claim 9.
[11] Claims 17 & 24.

evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence."

*McCoy v. Louisiana*, 138 S. Ct. 1500, 1508 (2018)(*quoting Gonzalez v. United States*, 553 U.S. 242, 248 (2008))(identifying "whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal" as the exceptions to this general rule). All of the items Braulick points to constitute areas of the trial that were within counsel's province.

Moreover, Braulick fails to show what counsel should have done and/or what information counsel should have obtained in the place of that which was presented to the jury. While in these claims Braulick posits counsel could have done more or taken a different approach during trial, he fails to identify any acts counsel could have undertaken that would have pointed to his innocence. Thus, Braulick has not overcome the presumption that counsel's actions in the present case "might be considered sound trial strategy." *See Strickland*, 466 U.S. at 689. Moreover, under § 2254(d), Braulick has not shown that the Montana Supreme Court unreasonably applied the first prong of *Strickland* to the facts of his case.

But even if this Court were to presume that Braulick could demonstrate deficient performance, he cannot show prejudice. Because an IAC claim must satisfy both prongs of *Strickland*, the reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 at 697 ("if it

31

is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice...that course should be followed."). A petitioner must affirmatively prove prejudice. *Id*. at 693. To demonstrate prejudice, Braulick "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." An assessment of prejudice "should proceed on the assumption that the decision-maker is reasonably, conscientiously, and impartially applying the standards that govern the decision." *Id*. at 695.

"When a defendant challenges a conviction, the question is whether there is a reasonably probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695. In the instant matter, the state had a strong case against Braulick. This is a fact that this Court must consider. *See Wainwright v. Sykes*, 433 U.S. 72, 91 (1977); *Allen v. Woodford*, 395 F. 3d 979, 999 (9th Cir. 2005)("even if counsel's conduct was arguably deficient, in light of the overwhelming evidence of guilt, [the petitioner] cannot establish prejudice"). As the Montana Supreme Court observed there was "overwhelming **direct** evidence of Braulick's guilt" presented to the jury. *Braulick v. State*, 2019 MT 234N at ⊧ 8 (emphasis added). This direct evidence included the testimony of Scott and Cheryl, the victims of Braulick's offense. Additionally, the jury heard

from Braulick himself.

Braulick does not convincingly argue that any of the actions of counsel, or his purported health diagnosis, would have altered the jury's decision or would have raised a reasonable doubt respecting guilt. *See Strickland*, 466 U.S. at 695. Or put another way, there is no indication in the record before this Court that the state court unreasonably applied *Strickland* when rejecting Braulick's IAC claim relative to the prejudice prong.  Because the Montana Supreme Court reasonably applied *Strickland*, Braulick is not entitled to relief.

## V.   **Certificate of Appealability**

A prisoner seeking relief under § 2254 may appeal a district court's dismissal of the petition only after obtaining a certificate of appealability (COA) from a district or circuit judge.  A COA may be issued only where a petitioner has made "a substantial showing of the denial of a constitutional right."  See 28 U.S.C. § 2253(c)(3).  A prisoner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

The Court finds that Braulick has not made a substantial showing of the denial of a constitutional right or that it erred in its procedural ruling and,

33

therefore, a certificate of appealability will not issue in this action. *See* 28 U.S.C. §
2253(c)(2); Fed. R. App. P. 22(b); *Miller-El*, 537 U.S. at 336; *Slack v. McDaniel*,
529 U.S. 473, 484 (2000).

Based on the foregoing, the Court enters the following:

## ORDER

1. The Petition (Doc. 1) is DENIED and DISMISSED.

2. The Clerk of Court is directed to enter by separate document a judgment
in favor of Respondents and against Petitioner.

3. The Clerk of Court is directed to attach a copy of the state court's decision
in *Braulick v. State*, Cause No. DV 16-118 (Sept. 12, 2016), as an exhibit to this
Order.

4. A certificate of appealability is DENIED.

DATED this day of June, 2023.

Susan P. Watters
United States District Court Judge

34